**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

---

Tamara L. Giwa
*Executive Director and*
*Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

May 9, 2024

By ECF and Email
The Honorable Natasha C. Merle
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

  Re: United States v. Halima Salman, 24-mj-350

Dear Judge Merle:

  I write on behalf of Ms. Salman in advance of the bail appeal currently scheduled for May 13 at 11:00 a.m.

  Halima Salman was born and raised in the United States, to a mother from New Hampshire and a father originally from Turkey. At 17 years old, Halima, along with her mother and eight siblings, was taken by her father from Turkey across the border to Syria into ISIS-controlled territory. Halima had been told that they were traveling to a town in Turkey to visit her father's relatives and to go camping. Her life was quickly turned upside down.

  Halima's father volunteered to fight for the Islamic State, and arranged a marriage for Halima—with another ISIS member—while Halima was still a minor. She had no choice in the matter. Halima was officially married before, or just after, her eighteenth birthday. She spent most of the time at home, cooking, banking, sewing, and cleaning the house. The town Halima and her family lived in was under constant bombardment. On one day, the house next to Halima's was targeted, and she and her siblings barely survived the fragmentation from the blast. Another time, Halima received a serious concussion from the overpressure of a bomb attack. She couldn't stand for a day, and still feels the effects of it. Halima had no interest in the Islamic State's ideology, but she was living under a repressive patriarchal regime and was beholden to the whims of the male figures in her life. She just wanted to get out of there.

  After her father was killed in a rocket attack, Halima somehow summoned the courage and wherewithal to flee. At 19 years old she left her husband and paid a smuggler to get her to Baghuz, a town near the border with Iraqi Kurdistan that was controlled by Kurdish forces, knowing that she'd likely end up in a camp for displaced persons. Miraculously, Halima was

reunited with her mother and siblings several months later, at al-Hol Camp run by the Syrian Democratic Forces. Soon after, armed guards forcibly separated many of the boys (including Halima's brothers), sending them to a so-called rehabilitation camp, called Houry Center. One of Halima's brothers, 'Bader,' was interviewed in 2022 by Human Rights Watch about the circumstances.[1] After years of detention in al-Hol Camp, Halima and her sisters and mother were transferred to a prison facility for several months, where Halima was physically abused by guards, before being sent to Roj Camp for the remainder of their detention.

UNICEF and human rights organizations have described in detail the abominable conditions at Al-Hol and Roj Camps, including unsanitary tents, disease, a lack of food and fresh water, nothing to shield from the harsh summers and winters of Northern Syria, and other acute deprivations. But Halima made the best of it. She ran a makeshift bakery, selling and bartering for her baked goods to provide for her family. Every day, she read to her younger siblings from English-language children's books. And every day, she tried to pursue repatriation, talking to Kurdish guards, trying to flag down passing military convoys through the fence, and speaking with visiting diplomatic personnel.

Earlier this week, now 25 years old, Halima and her family boarded a repatriation flight in Syria. It was the first time she'd seen her brothers in years. The reunion was short-lived. When they landed in New York, Halima was arrested and charged with receiving military-type training. Her siblings and mother are now in New Hampshire, staying with Halima's grandmother.

On May 7, at her initial appearance, Ms. Salman was ordered detained by the magistrate judge. *See* ECF No. 5. For the reasons set forth below, Ms. Salman respectfully asks that the Court vacate the detention order and order her release.

## I. STANDARD OF REVIEW

The Court's review of the detention order entered by the magistrate judge is *de novo*. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985) ("[A] district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion.").

## II. PROPOSED BOND

Ms. Salman requests that the Court release her on a moderate collateral bond, secured by real property and co-signed by Ms. Salman's mother, siblings, grandmother, and several family friends, as well as the grandmother's family home. Ms. Salman's grandmother currently has more than $151,000 of equity in her family home, and is willing to offer it as collateral on the bond. Ms. Salman would live with her mother, siblings, and grandmother, in the grandmother's New Hampshire home.

---

[1] *See* https://www.youtube.com/watch?v=zrSftB4wazw; *see also* https://www.hrw.org/news/2023/01/27/revictimizing-victims-children-unlawfully-detained-northeast-syria.

2

A list of proposed sureties is enclosed as Exhibit A. Suretors #5 and #6 are new additions and were not proposed as part of Ms. Salman's initial bail application. A letter of support from Suretor #5 is enclosed as Exhibit B.

The Court could also designate Ms. Salman's mother or grandmother as third party custodians, which would legally obligate them to assume supervision of Ms. Salman and report any violations of a release condition to the Court. *See* 18 U.S.C. § 3142(c)(B)(i). This, also, had not been proposed in Ms. Salman's application before the magistrate judge.

Along with the standard conditions, Ms. Salman should be released with the following additional conditions:

1. Report to Pretrial Services as directed;
2. Maintain a residence at her grandmother's address;
3. Submit to GPS location monitoring.
4. The defendant may not knowingly have contact with individuals or organizations that are affiliated with foreign terrorist organizations, or individuals or groups that promote violence for the purpose of effecting political change;
5. The defendant may not possess a firearm or any other instrument or materials designed to be used as a lethal weapon;
6. The defendant shall not attempt to acquire a passport or any other travel document;
7. The defendant will be subject to random home and community contacts by Pretrial Services; and,
8. The defendant must undergo mental health evaluation and/or treatment as directed by Pretrial Services.
9. The defendant must participate in a program administered by Parents for Peace, or another suitable program as directed by Pretrial Services

These conditions are more than sufficient to reasonably assure the safety of the community and Ms. Salman's appearance in Court.

With respect to Proposed Condition #9, this too is a new addition to Ms. Salman's bail application and was not presented before the magistrate judge. In October 2019, the U.S. Department of Justice directed United States Attorneys' Offices to create programs to develop alternative strategies to address terrorism and extremist threats in addition to or in lieu of traditional law enforcement remedies, where appropriate. Parents for Peace ("PFP") is a highly-regarded not-for-profit organization that has been providing services to meet this need for alternative and diversion strategies in cases involving extremism. It is an alliance of parents of extremists, former extremists, survivors of extremism, researchers, and clinicians with significant experience with and dedication to compassionate de-recidivism work in terrorism cases. Over the past seven years, PFP has assisted with hundreds of cases—successfully guiding the off-ramping and rehabilitation of individuals indoctrinated in a wide variety of extremist ideologies. They take a holistic approach involving weekly sessions with a mental health professional and other PFP staff, meetings with family, and other services. In addition to working with extremists, they

have lots of experience working with family members of extremists and people formerly living in extremist environments.

Staff members at PFP reached out yesterday about Ms. Salman's case, because they believe she is an ideal candidate. They are ready to begin working with her immediately. A letter from PFP is enclosed as Exhibit C.

### III. BAIL REFORM ACT

As the Supreme Court held in *Salerno*, "In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. 739, 755 (1987). This presumption of release is encapsulated in the Bail Reform Act. *See* 18 U.S.C. § 3142. The legal principles are familiar. The Court "shall order" release except in certain narrow circumstances where the Court finds that "no condition or combination of conditions would *reasonably assure* the appearance of the person as required and the safety of any other person and the community." *Compare* 18 U.S.C. § 3142(c) *with* § 3142(e). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

#### A. The Presumption is Easily Rebutted

Here, the statute charged in the complaint creates a *rebuttable* presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). The presumption inquiry proceeds in two steps. At Step 1, the Court must consider whether the defense has met the very low burden of production to rebut the presumption. Ms. Salman has clearly submitted sufficient evidence to rebut the presumption. At Step 2, the Court must consider the presumption alongside all of the other Section 3142(g) factors—even if the presumption has not been rebutted. Release is warranted in this case because there are numerous facts under Section 3142(g) that both rebut the presumption of detention and demonstrate that there are conditions of release that will reasonably assure both Ms. Salman's appearance in court and the safety of the community.

The Bail Reform Act imposes two checks on the presumption: (1) there is an easy-to-meet standard for rebutting the presumption and the prosecution always bears the burden of persuasion, and (2) the presumption alone does not warrant detention and must always be weighed along with other factors in § 3142(g).[2] Moreover, it is impermissible to detain a defendant in a presumption case based solely on the nature of the crime charged or the weight of the evidence.

To rebut the presumption, a defendant simply needs to produce "*some evidence* that he

---

[2] *See, e.g.*, Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis* 151 (2022), https://freedomdenied.law.uchicago.edu/.

will not flee or endanger the community if released." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (emphasis added); *see also United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) ("[T]o rebut the presumption, the defendant must produce some evidence."); *United States v. Gamble*, No. 20-3009, 2020 U.S. App. LEXIS 11558 at *1–2 (D.C. Cir. Apr. 10, 2020) (holding that "[t]he district court erred in concluding that appellant failed to meet his burden of production to rebut the statutory presumption" regarding dangerousness because "appellant did 'offer some credible evidence contrary to the statutory presumption,'" including information that he had a job offer) (unpublished) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)); *United States v. Wilks*, 15 F.4th 842, 846–47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government"). Indeed, the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707 (emphasis added); *Jessup*, 757 F.2d at 384.

### B. The Presumption Alone is Not Sufficient to Warrant Detention and Must be Weighed Along With the § 3142(g) Factors

Once the presumption is rebutted, the Court must weigh the presumption against all of the other evidence about the defendant's history and characteristics. "Once a defendant has met his burden of production . . . the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *United States v. Mattis*, 963 F.3d 285, 290–91 (2d Cir. 2020)*; see also Jessup*, 757 F.2d at 384 (holding that the judge should consider the rebutted presumption along with the § 3142(g) factors). The Court should not give the presumption undue weight if evidence relating to other § 3142(g) factors supports release.

In evaluating which if any conditions should be imposed that are the least restrictive, the Court looks to the following factors:

(1) the nature and circumstances of the crime charged;

(2) the weight of the evidence against the defendant;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to the community or to an individual that would be posed by release.

18 U.S.C. § 3142(g).

### C. Forbidden Considerations in a Presumption Case

A judge may not detain a defendant in a presumption case based solely on: (1) an unrebutted presumption alone, (2) evidence of the defendant's past dangerousness, (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt.

First, the defendant never bears the burden of persuasion—even if the presumption is unrebutted. It is not incumbent on the defendant to persuade the judge that there exist conditions of release that will reasonably assure the safety of the community. That burden of persuasion lies with the government, the standard of which is always clear and convincing evidence. *Wilks*, 15 F.4th at 846–47 ("[T]he burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention.").

Second, even if the presumption is not rebutted, a judge is prohibited from detaining a defendant "based on evidence that he has been a danger in the past[.]" *Dominguez*, 783 F.2d at 707. Instead, past dangerous conduct is relevant only to the extent that the government can prove—by clear and convincing evidence—that the defendant is "likely to continue to engage in criminal conduct undeterred [ ] by . . . release conditions." *Id.* Even when a defendant is charged with a serious crime, there are often release conditions that will reasonably assure the safety of the community.

Third, to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *Id.* at 706. Instead, this Court must analyze the defendant's individual characteristics under § 3142(g).

Fourth, the Court is forbidden from relying solely on the weight of the evidence of guilt to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id.* The likelihood of a conviction is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

## IV. MS. SALMAN MUST BE RELEASED BECAUSE THERE ARE CONDITIONS THAT WILL REASONABLY ASSURE APPEARANCE AND SAFETY

### A. The Nature and Circumstances of the Crime Charged

This case involves none of the aggravating facts present in other cases charged as receipt of military-type training. Ms. Salman was taken to ISIS-controlled territory against her will by her father, while still a minor. And while still a minor, her father married her off to another member of ISIS. As soon as she saw a window of opportunity following the death of her father, she left her husband and fled to the Kurdish-controlled border, knowing that she'd end up in a displaced persons camp. She spent the next five years trying to get home to the United States.

Ms. Salman never received military-type training, but even if she did there is no evidence—none—that Ms. Salman was radicalized or held extremist views, that she supported ISIS or believed in any of its goals. To the contrary, all who know Ms. Salman attest that she abhors violence and extremism.

Nor is there any allegation that Ms. Salman ever committed an act of violence, wanted to commit violence, or would have committed violence. The only allegation is that someone, at some point, taught her how to use a rifle.

It is of course well-documented that ISIS was brutally repressive towards women, and gives them little autonomy. They are subject to the will of their fathers and husbands, and were in many instances forced to receive military training. In fact the government has taken the position in other cases that girls and young women who were trained to fight by ISIS are victims, and not to be criminally charged, including in cases where the training was far more extensive (e.g. on multiple firearms, weapons and small unit tactics, explosives, and suicide attacks), than the training Ms. Salman is alleged to have received. The government's shifting position in this case is inexplicable, especially in light of the fact that the greater weight of the evidence shows a teenager who was at the mercy of her husband and father.

### B. The Weight of the Evidence

This prosecution is unprecedented. The government has never charged a case, whether for providing material support for terrorism or a terrorist organization, financing of terrorism, or terrorist training, *see* 18 U.S.C. §§ 2339A-D, where (1) the evidence of the defendant's guilt was this tenuous, and (2) there was no evidence at all of the defendant's support for ISIS, and no indication that the defendant's beliefs and intent aligned ISIS's goals.

The government's case relies entirely on several images found on a phone, which they claim belonged to Ms. Salman's ex-husband. The only evidence which could conceivably point to Ms. Salman ever receiving "training" is one photograph, of a purported ISIS document, which appears to document that she had been trained. Based on this evidence, the government has several insurmountable hurdles in proving its case.

<u>First</u>, the photograph of the document is plainly inadmissible at trial. There is no extrinsic evidence that the document is legitimate, and there is no witness who can authenticate the document or the photograph of the document.

<u>Second</u>, even if the government could authenticate this document (and they can't), and even if it was legitimate (which it isn't), there is no evidence that Ms. Salman ever actually *received* the training the photograph of the document suggests she received. Where was this training? How long was it? What did it involve? Who was the instructor? Who signed her up for it? Why did no witnesses see her attending this training? Did she pass? Was it "military-type" training? The government has no answer to these questions. It is not a crime to be in a room with a rifle, nor is it a crime to hold a rifle. It is a crime to receive "military-type" training, but there is no admissible evidence of that in this case, and even the inadmissible evidence is extraordinarily weak. Similarly, there is no corroborating evidence to show any desire, ideological motive, or intent to seek out such training, and what little evidence we have as to Ms. Salman's state of mind points to submission and coercion.

<u>Third</u>, even if Ms. Salman was taught how to use a rifle, the government cannot prove that she wasn't a minor at the time. Regarding the image of the purported ISIS record found on the phone, the Complaint states that "[m]etadata associated with the document image file depicted contains a date of March 17, 2018," when Ms. Salman was "approximately" 18 years old. *See* Comp. ¶ 24. At best, this shows that the *photograph* of the document was taken in March 2018, when Ms. Salman was 18 years old. It does not show that the underlying document was created after Ms. Salman had turned 18, or that she received the training after turning 18.

## C. The History and Characteristics of the Person

Ms. Salman is a deeply traumatized young woman who needs to be reunited with her family so that she can begin to heal from her horrific years-long ordeal. She, along with her mother and siblings, was taken to ISIS-controlled territory against her will by the one man who was supposed to be her protector. He then married her off to a man she didn't know. She survived hellacious bombing by U.S.-backed forces. After her father was killed in a rocket attack, she was able to make plans to flee. She spent the next five years in detention camps, under abominable conditions, pleading with guards, visiting diplomatic officials, and military personnel to be repatriated to the United States. She is finally home, and should be with her family not at MDC Brooklyn.

Ms. Salman has no criminal history, has never harmed anyone in her life, and has never expressed any violent or extremist sentiments. Those who know her describe her as a gentle and generous soul. The last two days since their arrival in the United States has been emotionally devastating and destabilizing for Ms. Salman and her family. They relied on each other to survive for years in the detention camps. The moral suasion provided by these family members, some of her proposed sureties, is enormous. She would never do anything to jeopardize their livelihood or risk being separated from them again. Ms. Salman will also have intensive support from Federal Defenders social work staff and Parents for Peace.

### D. Nature and Seriousness of the Danger to the Community

Under the Bail Reform Act, the conditions of release do not need to guarantee, but rather "reasonably assure" the safety of the community. *See United States v. Tomero*, 169 F. App'x 639, 641 (2d Cir. 2006) (reiterating that 18 U.S.C. § 3142(e) requires "a reasonable assurance rather than a guarantee" of community safety); *see also United States v. Schwamborn*, No. 06-CR-0328, 2007 WL 9653331, at *8 (E.D.N.Y. June 29, 2007) ("[T]he Bail Reform Act requires a reasonable assurance, not a guarantee, of safety.").

To detain a defendant based on danger to the community, the government's proof must be clear and convincing. 18 U.S.C. § 3142(f)(2)(B). To find danger to the community under that standard of proof "requires that the evidence support such a conclusion with a high degree of certainty." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). Even where there is a presumption of detention, "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). If the government satisfies that burden, the court must still determine whether there are conditions that will reasonably assure the safety of the community if the defendant is released. *See United States v. Khashoggi,* 717 F. Supp. 1048, 1049 (S.D.N.Y. 1989); *see also United States v. Paulino*, 335 F. Supp. 3d 600, 603 (S.D.N.Y. 2018) ("[T]he government must prove . . . not only a defendant's potential danger to the community, but also that no conditions can reasonably assure the safety of any other person and the community.").

Possessing a firearm or being trained to use one, without any evidence of intent or ability to use it, does not warrant a finding of dangerousness. More importantly, though, the fact that Ms. Salman is alleged to have been taught how to use a rifle *more than six years ago* has no bearing on her *current* danger to the community or her ability to abide by conditions imposed by the Court.

Ms. Salman, through sheer force of will, escaped from ISIS-controlled territory when she was 19 years old. She spent the next five years caring for her younger siblings, supporting her family, and trying to get home. There are many stories of violence and crime in the al-Hol and Roj Camps. Ms. Salman never participated in any of it. Instead, she spent her time baking and reading to her siblings. Ms. Salman was never a danger, and she is certainly not now. In *United States v. Mattis*, the Second Circuit recently observed:

> The government's position that the district court committed clear error in granting bail essentially boils down to an argument that the charged criminal conduct is so extreme and aberrant that it represents the new normal for the defendants, such that no set of conditions could reasonably assure the safety of the community. The acts alleged were indisputably dangerous and may have posed a serious risk to individuals in the surrounding areas. As a threshold matter, however, we must observe that the entire system for determining bail is premised on the belief that, at least to some extent, all criminal acts are aberrant. The very reason that Congress directed district courts to consider factors beyond just the severity of the offense is the recognition that an individual is more than the crime of which that

individual has been accused.

*United States v. Mattis*, 963 F.3d 285, 293 (2d Cir. 2020). Ultimately, the government's claim that Ms. Salman must be detained is based exclusively on the charges against her. Accepting the government's claim that the accusations in the Complaint are alone sufficient to warrant detention would improperly require the detention of any defendant accused under Section 2339D. *Cf. United States v. Cirillo*, 149 F. App'x 40, 43 (2d Cir. 2005) (noting that even for organized crime leaders, there is "no per se rule requiring . . . detention"). This is plainly at odds with the Bail Reform Act and current practice showing that even defendants accused of violent assaults and murder can be released on bail. *See, e.g.*, *Paulino*, 335 F. Supp. 3d 600 (ordering release of alleged gang member with criminal history accused of a participating in a violent assault where there was video of him assaulting the victim); *United States v. Messina*, 11-CR-031 (E.D.N.Y.) (KAM), Minute Entry Mar. 3, 2011 (affirming magistrate judge's order releasing alleged organized crime associate accused of murder, extortion, and racketeering); *United States v. Polito*, 02-CR-047 (E.D.N.Y.) (DGT), Dkt. 23 (ordering release of alleged organized crime associate charged with three counts of murder in aid of racketeering and facing the death penalty).

The government's exclusive reliance on the charged conduct—rifle training, more than six years ago, under a repressive regime that she was brought to against her will—simply cannot bear the weight the government assigns to it. And any theoretical risk of danger here can easily be mitigated with conditions. "Doubts whether [bail] should be granted or denied should always be resolved in favor of the defendant." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955); *accord United States v. Williams*, No. 17-CR-78-FPG, 2018 WL 3633296, at *2 (W.D.N.Y. July 31, 2018).

### E.  There is No Risk of Flight

By all accounts, after fleeing from ISIS territory Ms. Salman spent the last five years doing everything she could to get home to the United States. Although this is not the homecoming she expected or deserved, she has no desire or ability to leave. After years of relying on each other for survival in the detention camps, Ms. Salman is more devoted to her family than ever. She will live with them in New Hampshire, and would never abandon them. Her passport has been seized. She would be subject to electronic monitoring and couldn't go anywhere without Pretrial knowing. Her grandmother, who she adores, is putting her livelihood and property on the line. Family friends are also putting their livelihoods on the line.

Aside from the fact that flight would destroy Ms. Salman's beloved grandmother, mother, siblings, and family friends (and expose her to new and more serious charges), the nature of the charges in this case incentivize appearing for court as required. Unlike most ISIS-related cases where defendants are charged with material support for terrorism in violation of Sections 2339A and B, Ms. Salman's sentencing guidelines and statutory maximum sentence are far lower, and given the facts of the case, and the years she's already spent in detention, a sentence of probation—if convicted—is a possible if not likely outcome.

A finding of risk of flight must be supported by a preponderance of the evidence. *See United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987). Even if the Court finds that there's some risk, it can easily be mitigated by the proposed conditions.

### F. Conclusion

In sum, the government has not and cannot carry its high burden of proving by clear and convincing evidence that there are no release conditions that will reasonably assure the safety of the community. The government also cannot prove by a preponderance of the evidence that there are no conditions that would reasonably assure Ms. Salman's appearance in court. She cannot be detained.

Respectfully Submitted,

/s/
Samuel Jacobson
Assistant Federal Defender
(718) 407-7429

cc:   all counsel of record (by ECF)
       U.S. Pretrial Services (by Email)